J-A05015-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JARROD DOLPHIN | : | |
| Appellant | : | No. 209 WDA 2019 |

Appeal from the Judgment of Sentence Entered November 1, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0014805-2016

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                FILED MAY 27, 2020

Appellant, Jarrod Dolphin, appeals nunc pro tunc from the judgment of sentence of an aggregate term of 17 to 34 years' incarceration, imposed after he was convicted, following a non-jury trial, of third-degree murder, person not to possess a firearm, and carrying a firearm without a license. Appellant challenges the sufficiency and weight of the evidence to sustain his convictions, as well as the discretionary aspects of his sentence. After careful review, we affirm.

The trial court summarized the facts of Appellant's case, as follows:

> Samantha Arndt, a security officer with Nease Consulting Services was working on August 10, 2016[,] when she heard a call for assistance from the City of Pittsburgh Police related to shots fired. ([N.T. Trial, 7/31/18-8/6/18, at] 120). As part of her duties, she obtained security footage from the area of 856 Mt. Pleasant Road in Northview Heights. ([Id. at] 120). When she

_____

[*] Retired Senior Judge assigned to the Superior Court.

reviewed the footage, she … observed a male shoot another male, then run through 856 Mt. Pleasant and continue to an unknown location.  ([Id. at] 121).

Officer John Klaczak, an officer with the City of Pittsburgh's Night Felony/Mobile Crime Unit, testified that he arrived at 856 Mt. Pleasant Road in Northview Heights at 1:15 p.m. on August 10, 2016.  ([Id. at] 134).  Upon arrival, Officer Klaczak began to take photos of the scene.  ([Id. at] 136).  The photographs depicted the location of six (6) .40 calib[e]r empty cartridge casings, bloodstains, and [the] area around 856 Mt. Pleasant Road.  ([Id. at] 138-47).  Officer Klaczak also collected physical evidence, including the six (6) .40 calib[e]r shell casings.  ([Id. at] 148).

Marcel Cogburn testified that he was chilling and sitting around his house located at 856 Mt. Pleasant Road in Northview Heights in August 10, 2016[,] with his brother, Malik Cogburn,and his friends: Andre Barrow, Akil Williams, Brandon McCaskill, and "Little Homey."  ([Id. at] 152-54).  The real name of "Little Homey" is Jarrod Dolphin and was identified as … [Appellant]…. ([Id. at] 154, 173).  A little while later, "NuNu," whose real name is Manly Banks, III, arrived.  ([Id. at] 154).  At some point that evening, Marcel Cogburn went to his mother's house to get toilet paper.  ([Id. at] 155).  Marcel Cogburn later returned and was hanging out outside of his house with this group of friends.  ([Id. at] 166).  He went inside his house and heard gunshots.  ([Id. at] 169).  After the shooting, [Appellant] ran into Marcel Cogburn's house with Malik Cogburn.  ([Id. at] 177). Thereafter, [Appellant] ran down the steps, and out through the basement.  ([Id. at] 176).  When Marcel Cogburn looked outside, he saw that Manly Banks, III[,] was shot outside of his home.  ([Id. at] 165).

After the shooting, Marcel Cogburn, Malik Cogburn, Andre Barrow, Brandon McCaskill, and Akil Williams were taken into custody and photographed in the clothing they were wearing. ([Id. at] 157-62).

Malik Cogburn testified that he was at 856 Mt. Pleasant Road in Northview Heights on August 10, 2016[,] with [Appellant] and Manly Banks, among others.  ([Id. at] 183).  That evening, Malik Cogburn went outside of the residence and was followed by [Appellant].  ([Id. at] 186).  Manly Banks approached Malik Cogburn and [Appellant] from across the street and asked about

smoking marijuana. ([Id. at] 187). Malik Cogburn went a few houses down to obtain the marijuana and when he returned[,] Manly Banks was standing in front of or leaning on a stoop in front of 856 Mt. Pleasant Road and was talking to [Appellant], who was standing next to a railing. ([Id. at] 188). At this time, [Appellant] and Manly Banks began to argue about a word [Appellant] kept using. ([Id. at] 190-91). Manly Banks told [Appellant] to stop using the word "Jeez," and the matter escalated into a verbal argument. ([Id. at] 191-92). At this point, Malik Cogburn told Manly Banks to leave and come back tomorrow. ([[Id. at] 192).

According to Malik Cogburn, Manly Banks did not leave, but instead requested [Appellant] be removed from the premises. ([Id. at] 193). While they were arguing, [Appellant] drew his gun and shot Manly Banks, killing him. ([Id. at] 196). Manly Banks was not armed. ([Id. at 193). After the shooting, Malik Cogburn ran into his house and checked on his girlfriend. ([Id. at] 197). When Malik Cogburn saw [Appellant], he told [Appellant] to leave through the back door. ([Id. at] 197).

Officer Frank Niemiec, a police officer with the City of Pittsburgh Police[,] was working on patrol with Zone 1 on August 10, 2016. ([Id. at] 265). After he started his shift, he was heading to Northview Height[s] to assist with service of subpoenas when he heard a call on the radio that there were shots fired in the 800 block of Mt. Pleasant Road with a man down. ([Id. at] 267). When he arrived, he checked for a pulse, and did not feel one and began CPR. ([Id. at] 268). He continued performing CPR until the medics arrived. ([Id. at] 268-69). Officer Niemiec did not see a firearm anywhere [o]n or around Manly Banks. ([Id. at] 273).

Officer Donald Reola, a police officer with the City of Pittsburgh Police[,] was working in the Zone 1 area of the City on August 10, 2016. ([Id. at] 280). He was in the Northview Heights housing complex to serve subpoenas at 323 Mt. Pleasant Road. ([Id. at] 280). When he arrived at 323 Mt. Pleasant Road, he heard five (5) gunshots. ([Id. at] 281). Officer Reola announced what he heard and headed in that direction. ([Id. at] 282). Upon arrival, he found Manly Banks lying in a pool of blood with numerous gunshot wounds. ([Id. at] 282). Although [the officer] was not able to find a pulse, he began to perform CPR, which was ultimately unsuccessful. ([Id. at] 283).

Officer Artie Patterson, an officer with the Violent Crimes/Homicide Unit of the City of Pittsburgh Police[,] testified that she received a call ... for a homicide at 865 Mt. Pleasant Road. ([Id. at] 293). Officer Patterson interviewed Malik Cogburn on August 10, 2016[,] after he was taken to department headquarters for questioning. ([Id. at] 295). Malik Cogburn's statement to Officer Patterson was recorded and admitted into evidence. It was somewhat consistent with his trial testimony. First, he stated that he had turned to walk to go buy cigarettes, [and] was about two (2) feet away from the house when he heard five or six shots. ([Id. at] 297). He stated that there was no argument or talking or any form of disagreement before shots were fired. ([Id. at] 300). Malik Cogburn told Officer Patterson that the shooter, who he referred to as "G-Bo" and later identified as [Appellant], was not personally known to him, but that[,] based upon the language [Appellant] used, he believed [Appellant] was from the Hill District. ([Id. at] 302). After the shooting, "G-Bo" was calmly sitting on the couch when Malik Cogburn went to [place] a phone to call 911. ([Id. at] 302-03). When "G-Bo" realized that Malik Cogburn was getting a phone, "G-Bo" told Malik Cogburn that he would shoot his girlfriend if he didn't put the phone down. ([Id. at] 303). "G-Bo" then asked Malik Cogburn to sneak him out of the back door, which he did. ([Id. at] 306).

Detective George Satler, a City of Pittsburgh Homicide Detective, testified that on August 10, 2016[,] he received a call-out to assist with a homicide investigation. ([Id. at] 319). On that evening, he interviewed Andre Barrow and the next day, he interviewed Marcel Cogburn. ([Id.]). During the interview with Marcel Cogburn, Detective Satler showed him a photo array, and Marcel Cogburn positively identified the person he knew as "Little Homey," who was later identified to be [Appellant]. ([Id. at] 322, 335). Marcel Cogburn agreed to make a taped statement, which was admitted into evidence. At this time, Marcel was a teenager, and his parents were present in the interview room with him. ([Id. at] 324). Marcel Cogburn's statement was that he, Andre Barrow, Akil Williams, Brandon McCaskill, and [Appellant] were standing outside of 856 Mt. Pleasant Road. ([Id. at] 326-27). He stated that he went back into the house, along with a few others, and while he was in the bathroom, Manly Banks appeared. ([Id. at] 327). He went back outside to join Manly Banks, [Appellant], and Malik Cogburn, who were having a friendly discussion. ([Id. at] 329). A few minutes later, he went inside and less than a minute later he heard gunshots. ([Id.]). Immediately, Malik

- 4 -

Cogburn [ran] into the house followed by [Appellant]. ([Id. at] 330). At that point, [Appellant] was told by someone in the house to run, and he left the residence through the basement. ([Id. at] 331).

Detective Anthony Beatty, a City of Pittsburgh Police Officer assigned to the Violent Crimes/Homicide Unit, testified that he was called out from home on August 10, 2016[,] to investigate the fatal shooting of Manly Banks, III. ([Id. at] 354). After stopping at police headquarters to obtain supplies, he headed to the scene to begin his investigation. ([Id. at] 355). After [Appellant] was apprehended in McKees Rocks in October 2016, Detective Beatty took him into custody. ([Id. at] 361). He noticed that [Appellant's] physical condition appeared to be fine. ([Id. at] 362). Once in the car, [Appellant] asked the officers, "How did y'all find me?" ([Id. at] 363). [Appellant] was cooperative and followed directions. ([Id. at] 364). [Detective] Beatty read [Appellant] his Miranda[1] rights from the Pittsburgh Bureau of Police Miranda rights form. ([Id. at] 365). [Appellant] waived his rights, and agreed to speak with Detective Beatty. ([Id. at] 369).

Initially, [Appellant] denied being in Northview Heights or anywhere in that vicinity at the time Manly Banks was shot to death. ([Id. at] 369-70). However, after speaking with Detective Fallert, [Appellant] made the following audio and video recorded statement: he stated that on August 10, 2016, he went to hang out with people he thought were friends. ([Id. at] 390). He stayed there for a while, left, and came back. ([Id. at] 391). He was called outside for a cigarette, and he was approached by another male who stated, "leave Northview or [you'll] die." ([Id.]). [Appellant] replied, "you got it, big dog" and took a step back. ([Id. at] 393). The other male replied, "I'm not your dog, don't call me your dog," and pulled a gun from the center of his waistband. ([Id. at] 392-93, 405). [Appellant] then drew his firearm and fired his gun ten (10) or [eleven] (11) times. ([Id. at] 395). He then ran into the house, down into the basement, and out of the rear of the house. ([Id. at] 396). Shortly thereafter[,] he called a jitney, [which] took him toward Duquesne where he dismantled and disposed of the firearm, which he

_____

[1] Miranda v. Arizona, 86 S.Ct. 1602 (1966).

admitted was a Smith & Wesson 0.40 calib[e]r semiautomatic handgun. ([Id. at] 399).

There was no gun recovered at the scene of 865 Mt. Pleasant Road or on the person or clothing of Manly Banks. ([Id. at] 423-24).

Dr. Todd Luckasevic, a forensic pathologist/assistant medical examiner for the Allegheny County Medical Examiner's Office, after being qualified as an expert in forensic pathology, testified that he had examined the remains of Manly Banks, III, the victim in this case. ([Id. at] 432). He testified that Manly Banks had suffered from seven (7) gunshot wounds to his trunk and extremities. ([Id. at] 434). Dr. Luckasevic testified that gunshot wound "A" entered through the left chest and constituted three lethal wounds, as it injured the heart, lung, and aorta. ([Id. at] 435-36). The survivability for this type of wound is approximately one minute. ([Id. at] 437). Dr. Luckasevic testified that there was no natural disease process, and he concluded that Manly Banks died as a result of multiple gunshot wounds to the trunk. ([Id. at] 451). Further, Dr. Luckasevic testified that the manner of death was a homicide. ([Id.]).

Detective Beatty testified that [Appellant] had previous convictions for carrying a prohibited offensive weapon and did not have a license to carry a concealed weapon. ([Id. at] 475-77).

Trial Court Opinion (TCO), 5/29/19, at 3-8.

Based on this evidence, the trial court convicted Appellant of the above-stated offenses. On November 1, 2018, he was sentenced as set forth supra. Appellant filed a timely post-sentence motion, which was denied. He did not timely appeal, but after he filed a petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546, his appellate rights were reinstated. Appellant then filed the instant nunc pro tunc appeal, and he complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed its Rule 1925(a) opinion on May 29, 2019. Herein, Appellant states the following issues for our review:

- 6 -

I. Under Pennsylvania law, [did] the Commonwealth prove beyond a reasonable doubt that [Appellant] committed the crime of third[-]degree murder when [it] neglected to rebut [Appellant's] self-defense claim by failing to prove [Appellant] … provoked an act of violence, failed to retreat in those circumstances, or used excessive force?

II. Under Pennsylvania law, does a verdict for third[-]degree murder shock the conscience and warrant a new trial when [the] trial court ignored undisputed evidence, and misapplied the law of self-defense?

III. Under Pennsylvania law, did the trial court abuse its discretion by sentencing [Appellant] based on evidence and information already factored into the sentencing guidelines?

Appellant's Brief at 11 (unnecessary capitalization omitted).

Appellant's first argument challenges the sufficiency of the evidence.

Our standard of review for such claims is well-settled:

[W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

Commonwealth v. Gonzalez, 109 A.3d 711, 716 (Pa. Super. 2015).

Here, Appellant contends that the Commonwealth's evidence was insufficient to satisfy its burden of disproving his claim of self-defense. Our Supreme Court has made clear that "once some evidence, from whatever

source, is presented to justify a finding of self-defense, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the [appellant] was not acting in self-defense." Commonwealth v. Rivera, 108 A.3d 779, 791 n.7 (Pa. 2014) (citing Commonwealth v. Sepulveda, 55 A.3d 1108, 1124 n.13 (Pa. 2012) (citation omitted)). Our Court further explained in Rivera that,

> to prevail on a justification defense, there must be evidence that the defendant (a) … reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the defendant did not violate any duty to retreat. Thus, the Commonwealth satisfies its burden of disproving self-defense where it proves any one of the following: the defendant did not reasonably believe that it was necessary to kill to protect from himself imminent death or great bodily harm; the defendant was not free from fault in provoking or continuing the difficulty which resulted in the slaying; or, the defendant violated a duty to retreat or avoid the danger. Regarding the derivative and lesser defense of imperfect self-defense, all principles of justification must be satisfied, with the exception that there exists an unreasonable, rather than a reasonable belief that deadly force was required to save the defendant's life.

Id. at 791 (brackets, citations, and footnote omitted).

Here, the trial court found that the Commonwealth disproved Appellant's claim of self-defense, explaining:

> The facts, as set forth here, do not establish that [Appellant] acted in self-defense. Initially, the video evidence establishes that [Appellant], Manly Banks, and Malik Cogburn were standing outside of 865 Mt. Pleasant Road. Manly Banks was leaning on a brick pillar when [Appellant] pulls his firearm from his right pants pocket and fires seven (7) shots into Manly Banks, killing him. The video evidence did not show any aggressive movements or

- 8 -

mannerisms by Manly Banks prior to [Appellant's] actions. Further, testimony from Malik Cogburn established that [Appellant's] actions were unprovoked. As such, the Commonwealth disproved self-defense, and the evidence was sufficient to convict [Appellant] of third degree murder.

TCO at 10.

Essentially, the court found that Appellant was the aggressor in the shooting, and that his actions were not provoked by Banks. In challenging this decision, Appellant stresses his trial testimony that Banks threatened to kill him and that, as he took a step back to leave the scene, Banks "reached [in]to his waistband and pulled what [Appellant] believed to be a gun." Appellant's Brief at 20. Appellant points out that Malik Cogburn also testified that Appellant and Banks argued, and that, during the dispute, Banks "was taking his phone out, but it looked like he was drawing [a gun] because he was in a rage...." N.T. Trial at 194. Malik further stated that it was Banks who approached him and Appellant, "as opposed to [Appellant] going towards ... Banks and instigating an argument or a fight." Appellant's Brief at 21. According to Appellant, this evidence established that his "use of force was objectively reasonable under the circumstances because he had a reasonable belief that he was in fear of death or serious bodily injury[,]" and the Commonwealth failed to disprove that he acted in self-defense. Id. at 26.

We are unconvinced. Appellant disregards other evidence presented at trial that casts doubt on the credibility of his and Malik's trial testimony. For instance, Appellant does not contest the trial court's finding that, in the video of the shooting, Banks made no aggressive movements toward Appellant prior

to Appellant's pulling his gun. Moreover, just hours after the shooting, Malik provided a statement to police in which he claimed that Appellant and Banks were not arguing before the shooting. See N.T. Trial at 300. Specifically, Malik stated, "They wasn't arguing. They wasn't talking. It was nothing. It was just gunshots." Id. Notably, Malik made no mention of Banks' threatening to kill Appellant or reaching for his cell phone before Appellant fired his gun. Additionally, Malik's brother, Marcel, also told police that he observed Appellant and Banks having a friendly discussion less than a minute before shots were fired. See id. at 329.

Furthermore, we agree with the Commonwealth that Appellant's actions after the shooting cast doubt on the credibility of his claim that he shot Banks in self-defense. For instance, after the shooting, Appellant followed Malik into his house and, when Malik went upstairs to get a phone to call police, Appellant threatened to kill Malik's girlfriend if Malik did not put the phone down. Id. at 303. Appellant then fled from Malik's home, dismantled the murder weapon, and threw it in the river. Id. at 398. Appellant also admitted that approximately one month after the shooting, he discovered that the police were looking for him, yet he did not turn himself in. Id. at 400.

Additionally, when Appellant was apprehended two months after the shooting, he initially denied being at the scene at all. Id. at 371. He continued to deny that he was the shooter even after police confronted him with witness statements and images (taken from the video surveillance) that showed the shooter had a stomach tattoo identical to the tattoo on Appellant's stomach.

Id. at 372-75. Only after several conversations with detectives did Appellant finally claim that he shot Banks in self-defense.

Given the totality of this evidence, the Commonwealth sufficiently disproved Appellant's testimony that he acted in self-defense. Thus, his first issue is meritless.

Next, Appellant avers that the trial court's verdict was contrary to the weight of the evidence presented.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well[-]settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

Commonwealth v. Houser, 18 A.3d 1128, 1135-36 (Pa. 2011) (citations and internal quotation marks omitted).

Here, Appellant claims the trial court's verdict was against the weight of the evidence because it found that the Commonwealth had sufficiently disproved his self-defense claim "without any analysis or consideration of whether [Appellant] was the [a]ggressor, whether he violated a duty to retreat[,] or whether he used excessive force." Appellant's Brief at 31. Given our analysis of Appellant's sufficiency claim, set forth supra, we deem

- 11 -

Appellant's cursory challenge to the weight of the evidence inadequate to demonstrate an abuse of discretion by the trial court.

Lastly, Appellant argues that the sentence imposed by the court was excessive given "the particular circumstances of the offenses involved." Id. at 33 (capitalization and bold formatting omitted). Appellant's issue implicates the discretionary aspects of his sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. Commonwealth v. Sierra, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
> > We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, see Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, see Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).
>
> Commonwealth v. Evans, 901 A.2d 528, 533 (Pa. Super. 2006).... Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. Commonwealth v. Mann, 820 A.2d 788, 794 (Pa. Super. 2003)....
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. Commonwealth v. Paul, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." Sierra, supra at 912–13.

Commonwealth v. Griffin, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting Commonwealth v. Moury, 992 A.2d 162, 170 (Pa. Super. 2010)).

Here, Appellant filed a timely, nunc pro tunc appeal, and he preserved his claims in a post-sentence motion. In his brief, he includes a Rule 2119(f) statement in which he argues that the court's sentence is excessive because he has minimal criminal history, he presented "[s]trong evidence of [s]elf-[d]efense[,]" there was a "lack of evidence proving malice[,]" and the court considered conduct already taken into account by the sentencing guidelines. Appellant's Brief at 32-33. However, the only claim Appellant develops in any meaningful fashion is his assertion that the court improperly considered his "juvenile history ... [as] an aggravating factor" because his prior record was already factored into the calculation of the applicable sentencing guideline ranges. Id. at 35. We consider this claim as presenting a substantial question for our review. See Commonwealth v. Goggins, 748 A.2d 721, 731 (Pa. Super. 2000). Appellant's remaining arguments are waived for lack of development. See Commonwealth v. Johnson, 985 A.2d 915, 924 (Pa. 2009) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

In reviewing the merits of Appellant's sentencing challenge, we are mindful that,

> [s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an

abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

Commonwealth v. Shugars, 895 A.2d 1270, 1275 (Pa. Super. 2006).

Presently, Appellant complains that the court improperly 'double-counted' his juvenile record in imposing his sentence. In support, he quotes the following statement by the court at sentencing:

[The Court]: I do not find there to be any mitigating factors present. I do find that there [is] an aggravating factor and that you had multiple chances with rehabilitation both through Juvenile Court and Criminal Court. Most of these offenses were firearm offenses. You have not availed yourself of these opportunities for rehabilitation.

N.T. Sentencing, 11/1/18, at 588.

Contrary to Appellant's argument, we discern nothing improper about the court's consideration of his prior record. Clearly, the court took that information into account in assessing Appellant's potential for rehabilitation. The court noted that Appellant had not taken advantage of his prior opportunities to change his criminal behavior, and determined that a lengthier sentence was warranted in this case. The court did not abuse its discretion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/27/2020